## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## GREENVILLE DIVISION

**VIOLA ADAMS**                                                         **PLAINTIFF**

**versus**                                              Civil Action No. 4:18-CV-027-SA-JMV

**MERITOR, INC.; ROCKWELL
AUTOMATION, INC.; THE BOEING
COMPANY; and TEXTRON, INC.**                                    **DEFENDANTS**

---

### COMPLAINT
### *JURY TRIAL DEMANDED*

---

Plaintiff brings this action against the Defendants as follows:

### INTRODUCTION

1.      This is an action to recover personal injury and property damages from the Defendants for toxic torts committed against the Plaintiff, Viola Adams, which caused Plaintiff to suffer from Stage IB breast cancer and to lose the value of her home in the Eastern Heights neighborhood   ("Eastern Heights" or "neighborhood").

2.      In 1965, Rockwell International Corporation ("Rockwell"), or its corporate predecessor, acquired a manufacturing plant ("plant") located at 635 Highway 332, Grenada, Mississippi. The plant, situated adjacent to Eastern Heights, manufactured wheel covers (*i.e.,* hubcaps) which the plant produced through a series of manufacturing processes which utilized toxic and hazardous chemicals, including but not limited to hexavalent chromium, trichloroethylene ("TCE"), toluene, and fuels such as gasoline and various oils.   The manufacturing processes emitted noxious and toxic gases containing hexavalent chromium, TCE, and other volatile organic compounds into the atmosphere in and outside the plant facility, and plant personnel

---

regularly and frequently dumped and disposed of hazardous liquids, sludges or other solids wastes containing hexavalent chromium, TCE, toluene and other toxic chemicals. From 1965 through 1985, the plant was the second largest purchaser of TCE solvent in the United States, and it emitted toxic gases into the atmosphere, and dumped and disposed of hazardous liquids and solid wastes, at a location or locations which Defendants knew or should have known would impact the Eastern Heights neighborhood and harm the residents thereof in their persons and property.

3.      In 1985 Rockwell sold the plant to Randall Wheel Trim, Inc. ("Randall"), a subsidiary of Textron, Inc. ("Textron"), but even under Textron's ownership, the plant continued to pollute the atmosphere and damage the residents of Eastern Heights in their persons and property by emitting toxic gases which contained hexavalent chromium, TCE, toluene, and other volatile organic compounds. Further, even after the involvement of the United States Environmental Protection Agency ("USEPA" or "EPA") and the Mississippi Department of Environmental Quality ("MDEQ") at the plant site, Textron elected to forego the excavation and removal of contaminated soil at the plant site, particularly contaminated soil in the plant's equalization lagoon, and left such contaminated soils in place so as to present a continuing source of contamination adjacent, and into, the Eastern Heights neighborhood.

4.      As a result of the Defendants' intentional and negligent acts and omissions, the atmosphere in the Eastern Heights neighborhood, including both ambient and indoor air, was contaminated with toxic and hazardous gases, and the ambient and indoor air in the neighborhood remains contaminated to this day.

5.      As a result of the Defendants' intentional and/or negligent acts and omissions, the soil and groundwater on the plant premises, and at other locations at which Defendants dumped and

disposed of liquid and solid hazardous wastes, remain contaminated, and such contamination, *via* transmission through the soil and groundwater, has migrated into Eastern Heights and contaminated the property of the Plaintiff located therein.

6.      During their respective years of operation of the plant, the Defendants had actual knowledge of the toxic and hazardous nature of the chemicals which the plant utilized and actual knowledge of the equally toxic and hazardous nature of the gases and wastes which the plant released, emitted, discharged and dumped, including the dangers which its emissions and wastes presented to human health and the environment.

7.      Defendants' intentional and/or negligent acts and omissions, resulting in their release, emission, discharge and dumping of hazardous gases and wastes from their facility into the environment, proximately caused Plaintiff Viola Adams to suffer and sustain the injuries and damages alleged herein.

## PARTIES

8.      Plaintiff Viola Adams, who lives at 141 Tallahoma Drive in the Eastern Heights neighborhood, is an adult citizen of, and is domiciled in, Grenada County, Mississippi.   Plaintiff has resided at her address in Eastern Heights since 1979.

9.      Meritor Inc. ("Meritor"), named as a Defendant herein, is a corporation organized under the laws of the state of Nevada with its principal place of business at 2315 West Maple Road, Troy, Michigan 48084.   Meritor is admitted to do business in Mississippi and may be served with process through its registered agent, C.T. Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.   Through one or more corporate transactions, the details of which are not fully known by Plaintiffs as of this date, Meritor expressly assumed and acquired the environmental liabilities of Rockwell International Corporation arising out of its

operation of the Grenada plant.

10.     Rockwell Automation Inc. ("Rockwell Automation"), named as a Defendant herein, is a corporation organized under the laws of the state of Delaware with its principal place of business at 1201 S. Second Street, Milwaukee, Wisconsin 53204.   Rockwell Automation is admitted to do business in Mississippi and may be served with process through its registered agent, C.T. Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.   In 1996, Rockwell International Corporation created a subsidiary known as New Rockwell International Corporation which expressly assumed all liabilities of Rockwell International Corporation arising out of its operation of the Grenada plant.   Through a series of corporate transactions, the details of which are not fully known by Plaintiffs, the name of New Rockwell International Corporation was ultimately changed to Rockwell Automation.   As the corporate successor in interest to New Rockwell International Corporation, Rockwell Automation has likewise expressly assumed all liabilities of Rockwell International Corporation arising out of its operation of the Grenada plant.

11.     The Boeing Company ("Boeing"), named as a Defendant herein, is a corporation organized under the laws of the state of Delaware with its principal place of business at 100 N. Riverside, Chicago, Illinois 60606.   Boeing is admitted to do business in Mississippi and may be served with process through its registered agent, Corporation Service Company, 5760 I-55 North, Suite 150, Jackson, Mississippi 39211.   Through a series of corporate transactions, Rockwell International Corporation merged with Boeing NA, Inc., and the surviving corporation was named Boeing North American, Inc.   In 2000, Boeing North American, Inc. merged into The Boeing Company, with The Boeing Company as the surviving corporation.   Therefore, The Boeing Company is the corporate successor in interest to Rockwell International Corporation

which owned and operated the Grenada plant from approximately 1965 to 1985.

12.    Textron Inc. ("Textron"), named as a Defendant herein, is a corporation organized under the laws of the state of Delaware with its principal place of business at 40 Westminster Street, Providence, Rhode Island 02903.   Textron is admitted to do business in Mississippi and may be served with process through its registered agent, C.T. Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.   Textron's subsidiary, Randall Wheel Trim, Inc., acquired the Grenada plant from Rockwell International Corporation in 1985.   In 1987, Randall Wheel Trim, Inc. merged with and into Textron, Inc., with Textron, Inc. as the surviving corporation.   Textron continued operation of the Grenada plant until approximately 1999. Therefore, Textron is joined in this action as an owner and operator of the Grenada plant and as the corporate successor in interest to Randall Wheel Trim, Inc.

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this civil action pursuant to 28 U.S.C. §1332 in that (a) there is complete diversity of citizenship between the Plaintiff Viola Adams and all Defendants, and (b) the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

14.    Venue is appropriate in the district and division asserted as the acts, injuries and damages complained of herein occurred in whole or in part in Grenada County, Mississippi, and the manufacturing plant giving rise to this action was operated in Grenada County, Mississippi.

## FACTS

15.    In 1965 Rockwell International Corporation ("Rockwell"), or one of its corporate predecessors, acquired the Grenada plant located at 635 Highway 332 in Grenada County, Mississippi from Lyon, Inc.

16.    As established by Lyon, Inc., the plant manufactured automobile wheel covers by

forming raw stainless steel into the shape of hubcaps, buffing the hubcaps to a sheen, degreasing the hubcaps, and treating the hubcaps with hexavalent chromium, TCE, toluene and other toxic chemicals, processes which resulted in the daily generation of thousands of pounds of gaseous, liquid and solid wastes.

17.     After its acquisition of the plant, Rockwell continued the manufacture of  wheel covers, utilizing the same processes, procedures, and chemicals which were formerly utilized by Lyon, Inc. for production of the same, and continued to generate the same gaseous, liquid and solid wastes.

18.     Rockwell maintained large presses, weighing several tons each, which it used to stamp raw stainless steel into the recognized circular shape of hubcaps.   The weight of the presses damaged and cracked the foundation of the plant facility, leaving fissures therein from the surface of the plant floor to the soil underneath it.   The presses, frequently and regularly, leaked hydraulic oil which seeped from the plant floor through the fissures and into the soil and groundwater underlying the plant facility.

19.     Rockwell's buffing procedure utilized a buffing compound which, once used, was stored in a buff basement underlying the floor of the plant facility.   After buffing, the hubcaps were passed through a vapor degreaser which utilized liquid TCE as a solvent.   TCE was used in the vapor degreaser and as a general solvent for general maintenance and the cleaning of equipment, tools, and floors throughout the plant.   Used or spent TCE solvent from the vapor degreaser, as well as from drains located throughout the plant, emptied into the buff basement and saturated the used buffing compound.   By use of a plant dump truck, Rockwell hauled away from the plant, and dumped and disposed of approximately 325,000 pounds per month of buffing compound that was contaminated with TCE.

20. The plant operated a chrome-plating line by which a hexavalent chromium solution was electrically arced or "flashed" onto the buffed and degreased hubcaps. Following flashing, the hubcaps were rinsed in a series of tanks containing water or other solutions. The chrome-plating tanks and rinse tanks were regularly cleaned by Rockwell to remove sludges containing hexavalent chromium which accumulated therein. Rockwell employees shoveled these sludges into 55 gallon drums, and the plant employees regularly and frequently disposed of the content of the drums by hauling it away on the plant dump truck and dumping it along with the used buffing compound. Further, chrome rinse solutions, containing hexavalent chromium, flowed from the plant into an equalization lagoon contained on the plant's premises. Although such rinses were designed to flow through a destruct pit, to chemically change the hexavalent chromium to trivalent chromium, before reaching the equalization lagoon, this process was not dependable and often failed, resulting in significant deposits of hexavalent chromium into the equalization lagoon.

21. The equalization lagoon, which also received TCE and other liquid wastes *via* the plant's wastewater drainage system, was not lined with any clay or other protective barrier so as to prevent migration of the hazardous chemicals therein into the soil and groundwater around and underlying the lagoon. The equalization lagoon is located approximately 100 feet to the south of the Eastern Heights neighborhood.

22. After chrome plating, the hubcaps went through a paint department at the plant which utilized paint guns and apparatuses and stencils known as "paint masks" for affixing labeling and insignia on the hubcaps. All of the pain utilized at the plant contained toluene, a hazardous chemical which the plant utilized as a paint thinner. Further, after each use, each paint masked was dipped into a tank and sprayed with TCE solvent to remove the paint therefrom and ready it

for re-use on another hubcap.   Paint sludges, *i.e.,* paint residue containing TCE and toluene, was cleaned from the paint washing tanks, masks and tools and stored in 55 gallon drums.   Plant personnel regularly and frequently hauled paint sludges from the plant in the dump truck and dumped and disposed of it along with the used buffing compound.

23.    To supply the paint department with TCE, the plant utilized a closed-loop system which piped liquid TCE from the paint department through a coiled tank, known as a TCE still, which heated the TCE and returned it *via* piping to the paint department.   The TCE still generated sludges, known as "still bottoms," which consisted of pure TCE.   Still bottoms cleaned from the TCE still were stored in 55 gallon drums, and plant personnel, using the plant's dump truck, regularly and frequently dumped and disposed of still bottoms along with the used buffing compound.

24.    Before use, the plant stored TCE and toluene in tanks on the plant's premises which were connected to the plant by underground piping.   Both tanks leaked their contents into the soil and ultimately into the groundwater of the plant premises.   In the late 1970s to early 1980s, the TCE storage tank leaked thousands of gallons of TCE into the soil on the plant premises.   Rockwell knew about these leaks shortly after they occurred, but intentionally refused to report such occurrences to the appropriate regulatory agencies, and purposefully failed to take any action to excavate the contaminated soil or take any other timely action to prevent such hazardous chemicals from contaminating the groundwater.

25.    The plant, which produced approximately one million hubcaps a week, constantly emitted hexavalent chromium, TCE, toluene and other volatile organic compounds in gaseous form, fugitively and through stacks which emitted such gases into the atmosphere.   The Defendants never obtained any permit for such air emissions or otherwise disclosed their

contents to the appropriate governmental or regulatory agencies. Such toxic and hazardous gases polluted the air outside the plant facility, and caught by a prevailing southern wind, blew into the Eastern Heights neighborhood which lies adjacent and to the immediate north of the plant premises. Residents of Eastern Heights were exposed to such hazardous chemicals, in gaseous form from fugitive and stack emissions, from the time of the establishment of the neighborhood in the 1970s through at least the 1990s when Textron operated the plant. Further, residents of the Eastern Heights neighborhood continue to be exposed to TCE and volatile organic compounds in their ambient and indoor air, sourced by vapor intrusion emanating from the contaminated groundwater on the plant premises or contaminated groundwater which underlies the Eastern Heights neighborhood.

26. At all relevant times, the Defendants had actual knowledge of the toxic and hazardous nature of their gaseous, liquid and solid wastes which contained hexavalent chromium, TCE, toluene and other chemicals and actual knowledge of the dangers which such wastes presented to human health and the environment.

27. From 1965 through approximately 1982, Rockwell used the plant dump truck to dispose of its hazardous wastes at multiple locations. The dump truck, in daily operation by Rockwell, customarily ran at night, transporting about two to three loads per night of used buffing compound and hazardous sludges or liquids contained in 55 gallon drums. When arriving at a disposal location, plant personnel operating the truck dumped its contents, including hazardous substances in the drums, onto the bare ground. Rockwell never obtained any permit for such dumping or otherwise disclosed the hazardous nature of the wastes to any governmental or regulatory agency or affected landowner. At the instruction of the plant's management, the dump truck personnel hauled to and dumped at the following locations in or around Grenada

County, Mississippi:

a.      the plant premises;

b.      the Plaintiffs' neighborhood bordering the plant to the north;

c.      locations along or adjacent to Moose Lodge Road, which lies to the east of the plant premises and the Eastern Heights neighborhood;

d.      various other locations within five miles of the plant to the west, east, and northeast, including a gravel pit in northwest Grenada County;

e.      16th Section land in Grenada County near Grenada Lake, north of the dam;

f.      within 600 feet from the Grenada Lower Elementary School; and

g.      at a location along U.S. Highway 8 in the City of Grenada, on top of which a McDonald's restaurant and shopping center were built.

28.      Rockwell also, from time to time, disposed of hazardous wastes, including but not limited to hydraulic oil, by incineration of the same at night. This "night burning" by Rockwell released and discharged toxic gases and fumes into the environment and atmosphere of the plant premises and the Eastern Heights neighborhood.

29.      When Textron began operating the plant in 1985, it continued to pollute the environment of the plant premises and the Eastern Heights neighborhood by emitting gases containing hexavalent chromium, TCE, toluene and other volatile organic compounds into the atmosphere. Like Rockwell, Textron never acquired any permit for such emissions or otherwise disclosed to any governmental or regulatory agency the hazardous gases contained in such emissions. Further, Textron undertook remediation of the equalization lagoon, and even though Textron knew about the contamination in and around the equalization lagoon, Textron refused, on the basis of cost, to excavate the contaminated soils therefrom and elected to leave the same in place

in an unlined lagoon so as to allow hazardous substances to enter the groundwater and migrate into the Eastern Heights neighborhood.

30.    As a result of the Defendants' intentional and/or negligent acts and omissions, the plant premises remains contaminated with high concentrations of TCE and other chemicals in the soil and groundwater which is impacting the Eastern Height neighborhood.   Since the early 1990s, due to the Defendants' recalcitrance and refusal to timely and effectively remediate such contamination, the groundwater plume emanating from the plant premises and from the dump location along or adjacent to Moose Lodge Road has expanded into and is contaminating properties in the Eastern Heights neighborhood, including the property owned by Plaintiff.

31.    Since the early to mid 1990s, the Defendants, under oversight by the RKRA division of the USEPA, have been obligated to remediate the plant premises.   However, rather than remediate the plant premises, Defendants have engaged in an intentional scheme to forestall, delay and mislead the USEPA, which resulted in a contamination source which has gone unaddressed and expansion and worsening of the contamination plume emanating from the plant premises.   Finally, Defendants' evasion of their remedial responsibilities has exhausted the patience of the USEPA which announced on February 6, 2018 its intent to include the plant premises on the National Priorities List and to include the Eastern Heights neighborhood in such designation.

32.    Textron and Meritor, which expressly assumed the environmental liabilities of Rockwell, failed to take adequate, reasonable and timely measures to clean and remove the hazardous substances which they released and discharged into the environment on and around the plant premises, thereby allowing the contamination to migrate and impact the Eastern Heights neighborhood.   The Defendants took no actions to block or prevent the flow of

contamination into the Eastern Heights neighborhood. Instead, the Defendants constructed a Permeable Reactive Barrier ("PRB") west of Highway 332 to protect aquatic life in Riverdale Creek. The PRB is essentially a permeable, subterranean "wall" that is intended to filter out toxins as the plume passes through the wall. Predictably, the PRB failed, but even if it had worked it would not have blocked the migration of the contamination plume into Eastern Heights which lies to the northeast of the PRB.

33.    Long-term exposure to TCE and its degradation products, even at relatively low levels, is known adversely affect human health and is a recognized cause of autoimmune disease and cancer.   TCE is a known carcinogen.

34.    Short-term exposure to hexavalent chromium adversely affects human health, particularly the human respiratory tract.   Chronic exposure to hexavalent chromium increases the risk of cancer and is a recognized cause of damage to the human gastrointestinal and neurological systems.

35.    Upon information and belief, Defendants had actual knowledge of the fact that hexavalent chromium, TCE (with vinyl chloride), DCE, 1,2-dicloroethane, benzene, toluene, ethyl benzene, xylene, and other toxic chemicals generated by the plant's operation were present in the neighborhood and areas where these chemicals were dumped by the operators of the plant or migrated from the plant's dump sites.   In 2012 and 2013 Meritor conducted vapor point testing just outside the boundary of the neighborhood. A May 29, 2015 USEPA letter to Meritor regarding the vapor testing states the "results far exceed the lower risk threshold . . . and well exceed the risk threshold for prompt action." The USEPA letter also states:

> The EPA is concerned that TCE vapors from the groundwater plume may be intruding into the residences north of the facility.   If a completed pathway exists, exposure can potentially result in risks to human health (both long-term cancer and near-term non-cancer risk). The EPA is particularly concerned for sensitive

and vulnerable populations, especially women in the first trimester of pregnancy (because of potential cardiac mal formations to the developing fetus). Women of childbearing age are considered a sensitive population since they may not realize they are pregnant during the first trimester.

36.    Air, soil, and groundwater samples taken in and around the neighborhood indicate a completed pathway exists from the groundwater plume caused by the Defendants into the neighborhood and residences therein.   Maximum contaminant levels ("MCLs") and threshold value limits ("TVLs") are used to establish acceptable levels of these chemicals. The MCL for TCE in ground water is 5 parts per billion ("ppb"). In 1993, despite Rockwell's reports to the USEPA and MDEQ that TCE was contained within the plant site, Rockwell's sampling from MW-20, a well offsite from the plant and just three to four feet from the property line of an Eastern Heights' home, contained TCE concentrations of 18 ppb—more than 3 ½ times MCL. In approximately 2012, Meritor's reports show Meritor's own sampling from MW-20 contained TCE concentrations in excess of 500 ppb—more than 100 times MCL.

37.    A groundwater sample collected in 2015 at the border of the Eastern Heights neighborhood contained TCE concentrations of 2,900 parts per billion.

38.    The USEPA soil cancer screening level for hexavalent chromium is 0.00067 mg/kg. Soil samples from the Eastern Heights neighborhood in 2015 contained 0.56 mg/kg of hexavalent chromium—836 times the USEPA cancer screening level.

39.    A soil sample collected in 2015 from the northeast corner of the Eastern Heights neighborhood contained contaminants evidencing significant dumping of sludge and evidence of vinyl chloride, a degradation product of TCE.   The vinyl chloride concentration in this sample was 3,280 ppb, which is 4,750 times the EPA soil cancer screening level to protect infiltration to groundwater.

40.    Five outdoor air samples taken in 2015 from within the neighborhood ranged from 2.71

to 6.67 times the USEPA cancer screening level for TCE. An upwind air sample taken at the same time from south of the plant and the neighborhood detected no TCE.

41.     Sub-slab air samples collected in 2015 through holes drilled in the slabs of neighborhood homes detected solvents and aromatic hydrocarbons related to TCE and its degradation products.

42.     Air samples taken in 2015 from inside several neighborhood homes detected TCE concentration levels in excess of the USEPA cancer screening level. Also, in 2015, an air sample taken from the children's park in the middle of Eastern Heights detected TCE at 3.13 times the USEPA cancer screening level.

43.     Historical documentation of TCE usage at the plant was recorded and summarized by agents of the Defendants and documented for the years 1967 through at least 1992.   During such years, TCE continued to be used by the plant in large quantities, and such use resulted in TCE discharges in the form of gas emissions into the atmosphere.   In each of such years, the Defendants discharged hundreds of thousands of pounds of TCE in gaseous form, which was caught in the prevailing winds and impacted the Eastern Heights neighborhood.

44.     For each year from 1979 to at least 1990, emissions of TCE gas by the plant into the Eastern Heights neighborhood exceeded the USEPA cancer screening level.   Average monthly levels were at least 3 times higher than the USEPA cancer screening level, and monthly maximum concentration levels were 7 to 15 times higher than the USEPA cancer screening level.   These levels of TCE in gaseous form were present each day of each year of the plant's use of TCE, with no notice to any Eastern Heights resident of such discharges or of the dangers which such discharges presented to human health or the environment.

45.     On or about December 9, 2010, Plaintiff Viola Adams was diagnosed with Stage IB Breast Cancer after undergoing medical treatment which included a mammogram screening,

ultrasound guided biopsy, sonogram of the right breast, a computed tomography scan of her chest, and a stereotactic biopsy. Plaintiff underwent a lumpectomy operative procedure to remove the cancerous mass in her right breast on December 9, 2010, and subsequent pathological examination of the excised tissue returned the diagnosis of Stage IB Breast Cancer. Plaintiff underwent radiation therapy, chemotherapy and immune system therapy through April 25, 2012. At all times during Plaintiff's medical treatment, surgery, and recovery, Plaintiff suffered from severe physical discomfort, pain and mental anguish.

46.     Having resided at her home in Eastern Heights since 1979, Plaintiff Viola Adams was exposed to hexavalent chromium, TCE, toluene and other chemicals attributable to Defendants at levels far above USEPA air, soil and water cancer screening levels. Such contamination attributable to the Defendants proximately caused the personal injuries of which Plaintiff complains herein and contaminated and damaged Plaintiff's property in the Eastern Heights neighborhood, causing her to sustain a loss or diminution of value in the same.

## CAUSES OF ACTION

## COUNT I: INTENTIONAL AND/OR NEGLIGENT CONDUCT

47.     At all relevant times, Defendants owed Plaintiff Viola Adams a duty to safely dispose of their hazardous wastes, including the duty to exercise reasonable care in their use, handling, storage and disposal of TCE, hexavalent chromium, toluene, and other toxic substances which the plant used or generated.

48.     Defendants breached their duties by failing to reasonably monitor and control releases, emissions, and discharges of contaminants into the air, soil and water of the environment in close proximity to the Eastern Heights neighborhood, and by intentionally disposing of contaminants by dumping the same on the plant premises and along and adjacent to Moose Lodge Road,

locations from which such contaminants migrated into and contaminated the Eastern Heights neighborhood, and the property of Plaintiff Viola Adams which lies therein. Further, from the time of each release and/or discharge by the Defendants, Defendants knew or should have known that such contaminants presented a danger to human health and the environment, and therefore, Defendants breached their duty of reasonable care by failing to investigate, report, contain, minimize, remediate, clean-up, and eliminate such contaminants from the environment and locations where Defendants deposited the same in a reasonable, adequate and timely manner.

49.     Defendants further breached their duty of reasonable care owed to Plaintiff Viola Adams by failing to give her adequate and timely notice and warning of the hazardous nature of the gas emissions from the plant and of their hazardous waste disposal activities, when Defendants knew or should have known of the danger which their practices presented to human health and the environment.

50.     At all relevant times, the personal injuries and property damages suffered and sustained by Plaintiff Viola Adams were foreseeable and directly related to Defendants' actions.

51.     Defendants' intentional and/or negligent acts and omissions proximately caused the personal injuries and property damages complained of herein.

## COUNT II: NUISANCE

52.     Defendants created a condition that is injurious to properties within the Eastern Heights neighborhood, and to the health of the owners of such properties, and that fundamentally interferes with the rights of Eastern Heights residents to use and enjoy their property. Specifically, Defendants' actions and omissions have resulted in the creation and migration of contaminating substances onto air, soil and water of the Eastern Heights neighborhood, including the property owned by Plaintiff Viola Adams. In addition, the nuisance which Defendants

created, and which they have allowed to continue, proximately caused Plaintiff Viola Adams to suffer and sustain sickness, disease and injury..

53.     Defendants' actions in creating the nuisance, and their inactions resulting in failure to remediate or abate the same in a reasonable, adequate and timely manner, has proximately and substantially interfered with Plaintiff Viola Adam's use and enjoyment of her property in the Eastern Heights neighborhood, and caused her to suffer and sustain sickness, disease and injury.

## COUNT III: TRESPASS

54.     Defendants have caused hazardous substances, including hexavalent chromium, TCE, toluene, and other toxic substances to enter the air, soil, and ground water of Plaintiff's property and have thereby contaminated the same. The toxins which Defendants released and discharged into the environment continue to migrate into the Eastern Heights neighborhood and invade Plaintiff's property.

55.     Defendants' actions in causing such contamination and in failing to reasonably and timely remediate the same are the proximate cause of the past, present, and continuing trespass, injury, and actual damage to Plaintiff's property in the Eastern Heights neighborhood.

56.     Defendants are responsible for such trespasses upon Plaintiff's property which violated, and continues to violate, Plaintiff's right to exclusive use and possession of the same.

## COUNT IV: INTENTIONAL AND/OR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

57.     Notwithstanding Defendants actual knowledge of the danger to human health and the environment presented by the hazardous emissions and wastes which their plant generated, Defendants intentionally emitted, released, discharged, dumped and disposed of such hazardous substances; failed to reasonably and timely clean-up or remediate the same; and failed to warn or notify Plaintiff concerning the dangers which such hazardous substances presented.

Defendants' acts and omissions were directed at or toward property owners and others who would foreseeably be impacted by their intentional and/or negligent disposal of hazardous wastes, including the Plaintiff who resided in close proximity to the plant premises and other dump locations utilized by the Defendants. Defendants knew, or should have known, that their intentional and/or negligent acts and omissions would cause Plaintiff to experience severe emotional distress.

58. Defendants' conduct toward Plaintiff was malicious, intentional, and outrageous, evoking revulsion, and rises to the level of an intentional infliction of emotional distress.

59. At a minimum, or in the alternative, Defendants' conduct toward Plaintiff was negligent or grossly negligent and constitutes a negligent infliction of emotional distress.

60. Regardless of whether Defendants' conduct was intentional or negligent, it was reasonably foreseeable to Defendants that their conduct toward Plaintiff would cause Plaintiff to suffer severe emotional distress.

61. Consequently, Plaintiff is entitled to recover from Defendants all damages which Plaintiff has sustained for emotional distress as a proximate result of Defendants' intentional and/or negligent infliction of emotional distress.

## **CERCLA SAVINGS PROVISION**

62. To any extent necessary, Plaintiff invokes the procedural benefit of the savings provisions set forth in 42 U.S.C. §9658(a)(1), of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), because Plaintiff asserts claims under state law (including those for personal injury, property damage, and other rights of reimbursement for expense) caused or contributed to by exposure to hazardous substances, pollutants, or contaminants (such as hexavalent chromium, TCE and toluene) released into the environment by

the Defendants from a facility (*i.e.,* the plant) which Defendants owned, operated, and/or controlled.

## RELIEF REQUESTED

63.     Plaintiff is entitled to the recovery of damages in amounts to be determined at trial for all personal injuries and property damages which Plaintiff has sustained, as follows:

### Personal Injury

64.     As a direct and proximate result of the acts and omissions of the Defendants, Plaintiff Viola Adams contracted Stage IB Breast Cancer and is entitled to recover the following damages of and from Defendants:

a. Damages for sickness and disease, including any limitation of function related to such sickness and disease;

b. All necessary and reasonable medical costs incurred by Plaintiff in treatment of the aforesaid sickness, disease or injury;

c. On information and belief, medical costs to be incurred in the future in an amount which is reasonable and necessary;

d. Any lost wages or impairment of earning capacity which Plaintiff has sustained;

e. Pecuniary and other out-of-pocket expenses related to such sickness and disease, such as mileage expense and miscellaneous costs;

f. Damages for Plaintiff's pain, suffering and mental anguish, past and future;

g. Damages for the Defendants' intentional and/or negligent infliction of emotional distress upon Plaintiff;

h. Damages for the impairment of Plaintiff's quality of life, whether temporary or permanent; and

i.  Damages for any physical deformity or disfigurement, whether temporary or permanent.

**Property Damages**

65.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff's property has been contaminated and damaged, and Plaintiff is entitled to recover the following damages of and from the Defendants:

a.    Damages for the loss of, or diminution in, the value of Plaintiff's property in the Eastern Heights neighborhood;

b.    Damages for the cost of relocation of Plaintiff to a comparable residence in an uncontaminated location;

c.    Damages for the impairment of the right to use and enjoyment of the Plaintiff's property, and for violation of the Plaintiff's right to exclusive use and possession as a result of the trespass caused by the Defendants; and ;

d.    Damages for Defendant's intentional and/or negligent infliction of emotional distress upon Plaintiff.

**Punitive Damages, Attorneys' Fees, and Interest**

66.    Further, Plaintiff is entitled to the recovery from Defendants of:

a.    Punitive damages, to punish Defendants for their intentional, wanton, reckless and grossly negligent conduct, and to deter Defendants and others similarly situated from engaging in such conduct in the future;

b.    Attorneys' fees incurred in the prosecution of this action, in the event of an award of punitive damages;

c.    All prejudgment and post-judgment interest, to the extent allowed by law and determined by the Court.

---

## AD DAMNUM

WHEREFORE, PREMISES CONSIDERED, Plaintiff Viola Adams brings this action against the Defendants, Meritor Inc.; Rockwell Automation, Inc.; The Boeing Company; and Textron Inc., and demands judgment against the Defendants for all compensatory and actual damages, punitive damages, attorneys' fees, interests, and costs of Court, as plead hereinabove, in an amount in excess of the jurisdictional limit of the United States District Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury on all issues of fact presented in this action.

Respectfully submitted,

**LISTON & DEAS PLLC**

By:    /s/ William Liston III
WILLIAM LISTON, III, ESQ.
Mississippi State Bar No.8482
LAWRENCE DEAS
Mississippi State Bar No. 100227
Post Office Box 14127
Jackson, MS 39216
Tel. (601) 981-1636
Fax. (601) 982-0371
william@listondeas.com
lawrence@listondeas.com

**TED B. LYON & ASSOCIATES**

By:    /s/ Marquette Wolf
MARQUETTE WOLF
Mississippi State Bar No. 104996
18601 LBJ Freeway, Suite 525
Mesquite, Texas 75150

Tel. (972) 279-6571
Fax. (972) 279-3021
mwolf@tedlyon.com


**FUNDERBURG, SESSUMS & PETERSON, PLLC**

By:  /s/ Steven H. Funderburg
STEVEN H. FUNDERBURG
Mississippi State Bar No. 9959
Post Office Box 13960
Jackson, MS 39236-3960
Telephone:     (601) 355-5200
Facsimile:     (601) 355-5400
sfunderburg@fsplawfirm.com

***ATTORNEYS FOR PLAINTIFFS***